1:21-mj-00084-JCN

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, William Phelan, depose and make this affidavit in support of a complaint alleging

violations of Title 18, United States Code, Section 1344, and of Title 18, United States Code,

Section 1343, by the defendant Nathan REARDON.

I am a Special Agent ("SA") with the United States Department of Treasury Inspector

General for Tax Administration ("TIGTA") and have been employed as a Special Agent since

2010.  I am currently assigned to the Andover Internal Revenue Service ("IRS") Campus.  My

duties as a TIGTA SA include investigating external attempts to corruptly interfere with Federal

tax administration, and investigating threats made to the IRS and impersonation of the IRS.

Prior to joining TIGTA, I investigated passport and visa fraud, human trafficking, and conducted

protective intelligence investigations with the U.S. Department of State's Bureau of Diplomatic

Security Service ("DSS").  My investigations with both TIGTA and DSS have provided me with

experience investigating financial fraud and various economic crimes.  I have directed and

participated in investigations involving violations of Title 18, and during my investigations, I

have conducted dozens of criminal arrests, and seized evidence of violations of law.  In addition

to on the job training, I also have received extensive classroom training on investigating federal

crimes.  I am a graduate of the Criminal Investigator Training Program and the DSS Special

Agent Training Program at the Federal Law Enforcement Training Center.  I have a Bachelor of

Science degree in History from the University of Massachusetts.

I base this affidavit on my own investigation, my personal knowledge, and my training

and experience, as well as discussions with federal and local law enforcement personnel and my

reading of investigative reports and review of documentary and tangible evidence.  Because this

affidavit is being submitted for the limited purpose of establishing probable cause, I have not

1

included every fact known to me concerning the investigation, all of which I believe to be reliable and credible. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant has violated the federal bank fraud statute, Title 18, United States Code, Section 1344, and the federal wire fraud and related attempt statute, Title 18, United States Code, Sections 1343 and 1349.

## INVESTIGATION AND PROBABLE CAUSE

### I. BACKGROUND

#### A. Introduction

1. I am currently investigating REARDON for various crimes, including bank fraud, in violation of Title 18, United States Code, Section 1344, and attempted wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349. In addition, I am currently investigating REARDON for false statements to a financial institution, in violation of Title 18, United States Code, Section 1014, and false statements to the U.S. Small Business Administration ("SBA"), in violation of Tile 15, United States Code, Section 645(a).

2. I submit this affidavit in support of a criminal complaint charging REARDON with bank fraud, in violation of Title 18, United States Code, Section 1344. As set forth below, I have probable cause to believe that from about late March 2020 through at least March 2021, REARDON executed and attempted to execute a scheme to defraud TD Bank, N.A. ("TD Bank") and to falsely and fraudulently obtain TD Bank funds by and through his submission of a series of Paycheck Protection Program ("PPP") loan applications seeking funds guaranteed by the SBA.

3. Specifically, I have probable cause to believe that as part of the scheme, the PPP loan applications submitted by REARDON contained numerous representations and

certifications REARDON knew were false concerning three companies he owned and controlled: Global Disruptive Technologies, Inc. ("Global Disruptive"), Choice Auto Sales Group LLC ("Choice Auto"), and Membership Holdings Inc. ("Membership Holdings").

4.    For example, REARDON falsely represented and certified the truth and accuracy of the information and documents he submitted in support of the applications, and that any loan proceeds would be used for business purposes such as payroll and other covered expenses. As a further part of the scheme, REARDON submitted fabricated payroll and IRS tax documentation to substantiate his claim to TD Bank that each REARDON business averaged $23,658.00 in monthly payroll from January through March 2020. Such information was ultimately relied on by TD Bank to disburse a PPP loan on April 22, 2020 in the amount of $59,145.00 (2.5 times the supposed $23,658.00 amount). My investigation has revealed, instead, that this $23,658.00 figure was grossly inflated, and that REARDON paid those working for him only a fraction of this amount—or nothing at all—for the same time period. Many of the funds REARDON fraudulently obtained from TD Bank on April 22, 2020, he then spent on a variety of personal, non-payroll, and non-business related expenses. On March 8, 2021, however, REARDON perpetuated his fraudulent scheme by submitting to TD Bank an application seeking loan forgiveness of the entire $59,145.00 amount. In doing so, REARDON falsely and fraudulently stated that the April 22, 2020 PPP loan proceeds had been used for payroll and other covered expenses, and in addition, certified as true and submitted the same fabricated IRS tax documentation as he had in April 2020.

5.    I also submit this affidavit in support of a criminal complaint charging REARDON with attempted wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1349. As set forth below, I have probable cause to believe that from about April 2020

through at least September 2021, REARDON submitted one or more on-line applications from Maine using the SBA's Disaster Loan Assistance website as part of a separate scheme to fraudulently obtain federally-funded Economic Injury Disaster Loans ("EIDL"), an SBA loan product based on gross revenues and cost of goods sold.  One or more of REARDON's EIDL applications were processed interstate through servers in West Des Moines, Iowa.  REARDON sought the EIDLs in the names of his companies Choice Auto and Membership Holdings.  In doing so, REARDON falsely certified and represented that the companies had employees. However, neither business had employees.  Nor did the companies have revenues or profits.

6.      Accordingly, I have probable cause to believe that REARDON violated Title 18, United States Code, Sections 1344, 1343, and 1349.

**B.      Reardon and Global Disruptive, Choice Auto, and Membership Holdings**

7.      REARDON, age 43, is a resident of Skowhegan, Maine.  Throughout most of the 2020 timeframe at issue, REARDON resided in Brewer, Maine, and leased various office spaces in the vicinity of Bangor, Maine.  On his publicly available Facebook page, REARDON describes himself as follows:

> Nathan Reardon is possibly the most disruptive force in any arena he enters. Triple ASE master and owner of nearly 100 international businesses. He never settles for less than the best. Voted one of the worlds [sic] most noteworthy entrepreneurs.

*See* https://www.facebook.com/pg/realnathanreardon/about/?ref=page_internal (last visited Apr. 6, 2021).  REARDON has a publicly available website with similar content.  *See*

https://nathanreardon.com/ (last visited Apr. 6, 2021).

8.      Throughout 2020 and currently, REARDON has presented himself as the head of Global Disruptive.  Global Disruptive, according to public records available electronically on the Florida Secretary of State website, is an active Florida for-profit corporation.  It was incorporated

by REARDON on January 7, 2019.  REARDON is the President and Registered Agent of Global

Disruptive.  REARDON's father is a vice president of the business.  54 Perry Road, in Bangor,

Maine, is both the principal and mailing address of Global Disruptive.

9.      Over the past decade, in Florida alone, REARDON has incorporated

approximately twenty (20) businesses, including Global Disruptive, many of which are inactive

or have been dissolved.  *See* https://dos.myflorida.com/sunbiz (last visited Apr. 6, 2021).  At

issue for the present schemes are two other REARDON entities, Choice Auto and Membership

Holdings.

10.     Choice Auto, according to public records available electronically on the Florida

Secretary of State website, is an active Florida Limited Liability Company.  It was formed by

Mr. Reardon on June 9, 2017.  REARDON is listed as the Managing Member of Choice Auto.

Both the principal and mailing address of Choice Auto is 54 Perry Road, in Bangor, Maine.

11.     Membership Holdings, according to public records available electronically on the

Florida Secretary of State website, is an inactive Florida for-profit corporation.  The business

was administratively dissolved on September 25, 2020, for failing to file an annual report.  It had

been incorporated by REARDON on February 1, 2017.  REARDON had been the President and

Registered Agent of Membership Holdings.  His father had been vice president of the business.

Both the principal and mailing address of Membership Holdings had been 54 Perry Road, in

Bangor, Maine.

12.     Based on my investigation to date, including my review of business, judicial, and

banking records related to REARDON and my interviews of individuals who have worked for

REARDON in recent years, REARDON's public-facing persona did and does not accurately

depict his financial reality and that of his businesses.

13.     For example, REARDON has 2013 Maine state misdemeanor convictions for theft by misapplication of property, failing to collect taxes, and failing to pay taxes or file returns.  *See* MAINE CT. CRIM. DOCKET NO. AUGSC-CR-2011-00264.  REARDON has two prior bankruptcy proceedings in the U.S. Bankruptcy Court for the Southern District of Florida, in 2014 (BANKR. DOCKET NO. 14-bk-35030-EPK) and 2017 (BANKR. DOCKET NO. 17-bk-15705-EPK).  REARDON, Global Disruptive, and Membership Holdings were named as co-Defendants in a February 2020 Bangor District Court civil suit to enforce an $8,274.00 mechanics lien.  *See* MAINE CT. CIV. DOCKET NO. BANDC-RE-2020-15.  The "Corporate Office" address listed on the Global Disruptive website (777 South Flagler Drive, Suite 800 - West Tower, West Palm Beach, Florida), based on my open-source research, appears to be a "virtual office and business[] address for rent."  https://www.regus.ru/en-ru/virtual-office/united-states/florida/west-palm-beach/florida-west-palm-beach-philips-point (last visited Apr. 6, 2021) ("Why Choose a Regus Virtual Office?").

14.     Rather, my investigation has revealed that neither REARDON nor his companies conducted business generating revenues in 2020, and that, instead, REARDON's focus throughout that timeframe was on developing various properties and business ventures in the areas of Bangor, Newport, Howland, and Skowhegan, Maine.  The funds he used to do so, based on my investigation to date, were primarily received from his parents, outside investors, and SBA-guaranteed PPP funds disbursed by TD Bank.

## II.    THE BANK FRAUD

### A.    The PPP and TD Bank's Participation in the Program

#### 1.    *The SBA PPP*

15.     In response to the coronavirus ("COVID-19") pandemic and economic crisis,

Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Pub. L.

116-136.  The CARES Act was signed into law on March 27, 2020, providing for the PPP.  The

SBA received funding and authority to modify its existing loan programs and establish the PPP

to assist small businesses nationwide adversely impacted by the COVID-19 emergency.  Section

1102 of the CARES Act temporarily permitted the SBA to guarantee 100 percent of 7(a) loans

under the PPP, and Section 1106 of the CARES Act provided for forgiveness of up to the full

principal amount of qualifying loans guaranteed.  On April 24, 2020, President Donald J. Trump

signed the Paycheck Protection Program and Health Care Enhancement Act (Pub. L. 116-139),

which provided additional funding and authority for the PPP.

16.     As detailed on the SBA's website, "the [PPP] is a loan designed to provide a

direct incentive for small businesses to keep their workers on the payroll."  *See* U.S. SMALL

BUSINESS ADMINISTRATION, "Paycheck Protection Program," available at

https://www.sba.gov/funding-programs/loans/coronavirus-relief-options/paycheck-protection-

program (last visited Apr. 6, 2021) (the PPP is "[a]n SBA-backed loan that helps businesses keep

their workforce employed during the COVID-19 crisis").  Participating private lenders, rather

than the SBA itself, funded and disbursed the PPP funds to borrowers.

17.     Pursuant to applicable PPP rules and regulations established in April 2020, the

SBA set forth the following requirements for participating lenders and applicants:

a.   PPP applications required applicants to make good faith certifications, including but not limited to having employees for whom the applicant paid salaries and payroll taxes; that the PPP funds would be used to retain workers and maintain payroll or other covered expenses; that the information provided in the application and all supporting documents and forms was true and accurate; and that the tax information and documentation submitted by applicants was identical to that submitted to the IRS.

b.   The maximum permitted loan amount could not exceed the amount of an employer's average monthly payroll costs multiplied by 2.5.

c.   PPP loan proceeds could only be used for payroll costs, rent payments, utility payments, and interest payments on mortgages and other debt obligations, with at least 75 percent of such proceeds required to be used for payroll costs.

d.   Borrowers were prohibited from receiving more than one PPP loan in 2020 according to the SBA's "one loan per borrower" rule.

### 2.    *TD Bank*

18.    As indicated above, participating private lenders, rather than the SBA itself, initially funded and disbursed the PPP funds to borrowers under the program.

19.    TD Bank was one such lender participating in the PPP locally in the state of Maine.

20.    I have confirmed by reference to certified business records provided by the Federal Deposit Insurance Corporation that TD Bank has had its deposits federally-insured since May 31, 2008.

1:21-mj-00084-JCN

21.    Because of the economic circumstances of the COVID-19 pandemic, the SBA established special underwriting rules applicable to PPP lenders' assessment of applications under the program.  Participating lenders were required to confirm: (i) receipt of borrower certifications contained in the PPP application form issued by the SBA; (ii) receipt of information demonstrating that a borrower had employees for whom the borrower paid salaries and payroll taxes; and (iii) the dollar amount of average monthly payroll costs by reviewing the payroll documentation submitted with the borrower's application.

22.    Each lender's underwriting obligation under the PPP was expressly limited by SBA rule and regulation to these items concerning their review the PPP application form. Private lenders such as TD Bank were therefore allowed by the SBA "to rely on certifications of the borrower in order to determine eligibility of the borrower and use of loan proceeds and to rely on specified documents provided by the borrower to determine qualifying loan amount and eligibility for loan forgiveness."  *See* FED. REG. 85 FR 20811, at 20812 (Apr. 15, 2020).

23.    As discussed below, I have reviewed TD Bank's internal documentation and business records pertaining to its underwriting the first PPP loan application submitted by REARDON for Global Disruptive, and have additionally interviewed bank personnel involved in that process.  On the basis of such review and my interviews, I have confirmed that TD Bank personnel did in fact rely on the information, documentation, and certifications provided by REARDON.  The information, documentation, and certifications provided by REARDON, as discussed below, was knowingly false and fraudulent.

1:21-mj-00084-JCN

B.    **Reardon's Businesses in January through March 2020**

24.    As part of my initial investigation of REARDON and his businesses, I reviewed

Global Disruptive, Choice Auto, and Membership Auto TD Bank account records covering

January 1, 2020 through March 31, 2020, which showed the following:

a.    Global Disruptive did not have accounts with TD Bank until December 27,

2019, when REARDON opened a simple checking account ending -7420 with

his father.  Between January 1, 2020 and March 31, 2020, deposits to the

Global Disruptive account totaled $10,450.00,[1] of which $6,200.00 came from

check or cash deposits made by REARDON's parents.  Based on my review

of imaged checks drawn on this Global Disruptive account, various employees

were paid approximately $1,353.18 over the first three months of 2020:

| Date of Check | Check No. | Amount | Check Detail |
|---|---|---|---|
| Feb. 5, 2020 | 7501 | $500.00 | [blank] |
| Feb. 10, 2020 | 7506 | $345.00 | P.r. pd in full |
| Feb. 10, 2020 | 7500 | $100.00 | p.r. adv |
| Feb. 10, 2020 | 7504 | $72.03 | pr. |
| Mar. 24, 2020 | 7516 | $336.15 | pd in full / PR |

b.    Choice Auto did not have accounts with TD Bank until April 24, 2020, when

it opened a simple checking account ending -7251.  This Choice Auto account

was opened with a $25.00 deposit on April 27, 2020, and closed soon after on

May 7, 2020.  The account showed no other deposit or withdrawal activity.

c.    Membership Holdings also did not have accounts with TD Bank until April

24, 2020, when it opened a simple checking account ending -7991.  This

Membership Holdings account was opened with a $25.00 deposit on April 27,

---

[1]    $3,375.00 in January, $3,000.00 in February, and $4,075.00 in March.

2020, and closed soon after on May 7, 2020. The account showed no other

deposit or withdrawal activity.

25.     For the same period of time, January 1, 2020 and March 31, 2020, I also obtained

and reviewed business records provided by the Maine Department of Labor's Bureau of

Unemployment Compensation ("MDOL"), to see whether Global Disruptive, Choice Auto, and

Membership Holdings had reported employee wages, unemployment contributions, and related

information. Based on my review of such materials, I determined the following:

    a.   MDOL had an active employer account number for Global Disruptive.

        However, the MDOL records showed that Global Disruptive reported total

        wages in January-through-March 2020 of $13,778.00, and no reported wages

        thereafter. The MDOL records showed that Global Disruptive had never

        made unemployment contribution payments.

    b.   No active employer account number existed for Choice Auto. MDOL records

        reported no employee or wage information for Choice Auto at any time.

    c.   No active employer account number existed for Membership Holdings.

        MDOL records reported no employee or wage information for Membership

        Holdings at any time.

26.     I also obtained and reviewed business records provided by Hiscox Insurance

Company Inc. ("Hiscox"), which had appeared in several debits listed in Global Disruptive's TD

Bank checking account ending -7420. The Hiscox records showed that REARDON had applied

and contracted for a commercial general liability policy in February 2020. The Hiscox policy

application submitted by REARDON contained the following question:

    For the next 12 months, what is your estimated payroll expense for yourself, your
    full-time, part-time, and temporary employees? (Do not include subcontractors.)

REARDON indicated in response to this question that Global Disruptive's estimated payroll for the upcoming twelve months was $10,000.00 in total.

27.     As part of my investigation, I have also interviewed individuals previously employed by REARDON.  One such employee who I interviewed (hereinafter referred to as "Employee 1"), had worked for REARDON performing office assistance and bookkeeping functions on a part-time basis throughout 2020.  Employee 1 stated, in sum and substance, as follows:

> a. Employee 1 worked for Global Disruptive for minimum wage on a part-time basis from January through March 2020, however, Employee 1 was not paid for Employee 1's work for these first three months of 2020 and is still owed money by REARDON for such work.
>
> b. REARDON's father was not an employee of Global Disruptive, and did not earn a salary.
>
> c. Employees of Global Disruptive were generally paid by check.  REARDON would review the checks and would hand them out personally.
>
> d. Individuals performing work for REARDON in 2020 did so as employees of Global Disruptive, rather than any other REARDON entity, e.g., Choice Auto or Membership Holdings.

**C.     Reardon's April and May 2020 PPP Loan Applications to TD Bank**

*1.     Reardon's initial correspondence with TD Bank about the PPP*

28.     I have conducted interviews of TD Bank employees.  I have also reviewed their contemporaneous email correspondence with REARDON regarding the PPP loan applications at

issue.  My investigation showed that REARDON was repeatedly and specifically informed about the SBA's PPP requirements by TD Bank personnel.

29.     REARDON contacted TD Bank to inquire about obtaining a PPP loan within days of the CARES Act's passage into law on March 27, 2020.  In response, on April 2, 2020, a Store Manager of TD Bank's 77 Exchange Street, Bangor, Maine, location (hereinafter referred to as the "TD Bank Store Manager") provided REARDON details via email.

30.     In the April 2, 2020 email, the TD Bank Store Manager informed REARDON about the SBA's PPP, including as follows:

    a.  "[T]he tool to calculate your loan request is critical."

    b.  The "PPP will provide loans for businesses to cover payroll, employee benefits, mortgage interest, utilities, rent and interest on other debt."

    c.  The "loan amount is based on a formula of 2.5 times the borrower's average monthly payroll costs."

31.     REARDON began providing documents to the TD Bank Store Manager via email on April 2, 2020.

32.     For example, on April 2, 2020, REARDON forwarded to the TD Bank Store Manager a .jpeg document entitled "Affiliation List" for Global Disruptive.  This document was handwritten, signed, and dated by REARDON as of that same date.  This "Affiliation List" document stated that Choice Auto and Membership Holdings—as "affiliates" of Global Disruptive—both had zero employees and $0.00 in gross receipts over the prior three-year period.

33.    In a follow-up email sent to REARDON on April 3, 2020, the TD Bank Store Manager reiterated to REARDON that the SBA's PPP used an applicant's average monthly payroll multiplied by a factor of 2.5 to cap a borrower's eligible loan amount.

### 2.    *Reardon's April 3, 2020 Global Disruptive PPP loan application*

34.    On April 3, 2020, REARDON submitted to TD Bank a Global Disruptive PPP loan application dated April 3, 2020.

35.    The application certified that Global Disruptive had an average monthly payroll of $23,658.00.  The application sought a PPP loan in the amount of $59,145.00 to cover payroll, lease / mortgage interest, utilities, and "materials."  This figure is 2.5 times 23,658.00.

36.    The application also contained certain certifications, all of which REARDON affirmed, including the following:

       a.    "The funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments; I understand that if the funds are used for unauthorized purposes, the federal government may pursue criminal fraud charges."

       b.    "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program."

       c.    "I further certify that the information provided in this application and the information that I have provided in all supporting documents and forms is true and accurate.  I realize that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000;

under 15 USC 645 by imprisonment of not more than two years and/or a fine

of not more than $5,000; and, if submitted to a Federally insured institution,

under 18 USC 1014 by imprisonment of not more than thirty years and/or a

fine of not more than $1,000,000."

d.   "I acknowledge that the lender will calculate the eligible loan amount using

tax documents I have submitted.  I affirm that these tax documents are

identical to those I submitted to the IRS."

REARDON further represented in the application, "[a]ll SBA loan proceeds will be used only for

business related purposes as specified in the loan application."

37.    A photograph of an IRS Form 941, "Employer's Quarterly Federal Tax Return"

for Global Disruptive was submitted by REARDON to TD Bank in support of the application.

The purported tax document was for the first quarter of 2020 (January, February, and March).

The Form 941 indicated that the total first quarter wages, tips, and other compensation paid by

Global Disruptive totaled $70,974.61 for the first quarter of 2020, and that $9,044.00 in federal

income tax had been withheld.  The Form 941 was signed by REARDON, as President of Global

Disruptive, and dated April 1, 2020.

38.    In further support of the application, REARDON submitted a document entitled

"Payroll Summary January through March 2020" (hereinafter referred to as the "Payroll

Summary").  The "Payroll Summary," as with the Form 941, listed $70,974.61 in gross pay and

$9,044.00 in federal income tax withheld.  The $23,658.00 average monthly payroll amount

certified in the application is a function of dividing the $70,974.61 gross pay amount three ways

to account for each month in the first quarter of 2020.

39.      The "Payroll Summary" listed a total of $64,884.61 in "salary" paid by Global

Disruptive to three individuals from January through March 2020: (i) $14,000 to Employee 1;

(ii) $28,000 to REARDON's father; and (iii) $22,884.61 to an employee whom I determined

through my investigation to be an individual handling REARDON's information technology

work (hereinafter referred to as the "IT Employee").  The "Payroll Summary" indicated that the

remaining 14 individuals listed were paid a total of $6,090.00 in gross pay for "straight time."

The "Payroll Summary" indicated that federal taxes were withheld from the pay of all

individuals listed in the document, both salaried and straight time.  In addition, the "Payroll

Summary" indicated that Global Disruptive paid Maine state unemployment insurance taxes.

40.      Following REARDON's submission of the application and supporting

documentation, a Relationship Manager employed by TD Bank in Portland, Maine (hereinafter

referred to as the "TD Bank RM"), emailed REARDON.  The TD Bank RM introduced himself

as the commercial lender who was working on Global Disruptive's PPP loan application.  The

TD Bank RM requested additional documentation for consideration.  On April 11, 2020,

REARDON replied via email, asking that the TD Bank RM use the 2020 information earlier

provided in assessing the Global Disruptive PPP loan application.

41.      I have interviewed the TD Bank RM in connection with the application and

supporting documentation as it pertained to TD Bank's decision to fund the requested

$59,145.00 loan.  I have further reviewed TD Bank records and underwriting guidance

applicable to the loan application.  On the basis of such investigation, I have determined that TD

Bank considered important and relied on REARDON's certifications and documentation

comprising the Global Disruptive April 3, 2020, PPP loan application.

1:21-mj-00084-JCN

42.     As such, on April 13, 2020, relying on REARDON's certifications and
documentation, the TD Bank RM approved Global Disruptive for a PPP loan in the amount of
$59,145.00.  On April 21, 2020, REARDON e-signed a TD Bank Promissory Note for the PPP
loan, assigned SBA loan number 7341997107.

43.     On April 22, 2020, the $59,145.00 loan was disbursed into the Global Disruptive
checking account ending -7420.  The account had been in overdraft status the previous day, April
21, 2020, with a negative balance of $4,062.76, such that all funds in the account as of April 22,
2020, were shown to be exclusively PPP loan funds.

44.     I have reviewed REARDON's spending from the Global Disruptive account
following the April 22, 2020, PPP loan deposit.  I have also obtained business records from
third-party vendors and payees.  Based on my investigation, although REARDON did use some
of the funds to pay those who performed work for him, I have determined that REARDON spent
the majority of the PPP loan monies (approximately $25,000, and possibly more) on prohibited
personal, non-business, expenses, all in violation of his prior certifications and representations.
My findings include the following:

      a.  REARDON withdrew $4,850.00 of the PPP funds between April 24 and May
         4, 2020, via the third-party payment processing application Venmo.
         According to my review of Venmo records and interviews of two of the three
         witnesses receiving the funds, REARDON then used his Venmo account to
         repay personal loan obligations.

      b.  TD Bank records as well as records provided to me by Christ Fellowship
         Church, of Palm Beach Gardens, Florida, showed that REARDON used

$5,000 of the PPP funds to make donations to the church between April 27 and May 5, 2020.

c.  My review of TD Bank records as well as those provided by the Internet-based retailer Amazon showed that Reardon spent over $5,000 of the PPP funds on-line shopping.  Purchases included a men's 14 carat yellow gold wedding band; men's clothing; men's shaving products; toys; and an LED barber pole light.

d.  TD Bank records indicate that on April 27, 2020, REARDON made a payment of $3,090.00 from the PPP funds to an attorney in Searsport, Maine. I have reviewed the Bangor District Court records in Docket No. BANDC-RE-2020-15, and confirmed that the attorney who received this $3,090.00 payment is the same attorney who was representing REARDON personally in the mechanics lien litigation.

e.  The same day as the loan disbursed, April 22, REARDON wrote a check payable to "cash" in the amount of $7,000.00 of the PPP loan funds (Check No. 7664).  He withdrew another $3,500.00 of PPP loan funds in ATM debits between April 22 and May 1, 2020.

f.  My review of TD Bank records and records from a local area veterinary clinic showed that Reardon spent $421.35 of the PPP funds on April 27, 2020, to have his dog castrated.

g.  My review of TD Bank records and records from Tecovas, a purveyor of high-quality cowboy boots, showed that REARDON spent $522.23 of the PPP funds on May 2, 2020, on a pair of caiman skin cowboy boots.

1:21-mj-00084-JCN

45.     In sum, as detailed above, REARDON's PPP loan application contained numerous material falsehoods and misrepresentations, which TD Bank considered and relied on as true in approving and disbursing the loan.  For example, my investigation has confirmed that the IRS has no record of Global Disruptive filing the Form 941 submitted by REARDON in support of the loan application, and no record of Global Disruptive making any employer tax filings for 2020.  In addition, based on my investigation, REARDON knowingly and grossly inflated the $70,974.61 payroll total he submitted for Global Disruptive for the January-through-March 2020 period.  Employee 1 earned no salary during this period of time, rather than the $14,000.00 quarterly salary claimed; REARDON's father was not an employee earning a $28,000.00 quarterly salary; and my investigation indicated that the IT Employee made less than $5,000 from January through May 2020, rather than the $22,884.61 quarterly salary claimed.  Further, as just discussed, REARDON used thousands of dollars of PPP loan funds to pay personal expenses.

### 3.     *Reardon's April 30, 2020 Global Disruptive PPP loan application*

46.     On April 30, 2020, just over a week after receiving the PPP loan, REARDON submitted a second application for a PPP loan to TD Bank on behalf of Global Disruptive.  The application again falsely certified that Global Disruptive had an average monthly payroll of $23,658.00, seeking a second loan in the amount of $59,145.00 to cover payroll, lease / mortgage interest, and utilities.  In support of the application, REARDON made similar false certifications and misrepresentations as he had in the first application, including the following:

1:21-mj-00084-JCN

a. "The Applicant was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC."[2]

b. "The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud."

c. "During the period beginning on February 15, 2020 and ending on December 31, 2020, the Applicant has not and will not receive another loan under the Paycheck Protection Program."

d. "I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects.  I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a Federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

---

[2]    This particular certification does not appear to have been present in the earlier iteration of the SBA PPP borrower application form Global Disruptive submitted on April 3, 2020.  Additional variations to the several other certifications also appear to have been made by the SBA, however, are non-substantive.

e.  "I acknowledge that the lender will confirm the eligible loan amount using
required documents submitted.  I affirm that these tax documents are identical
to those I submitted to the IRS."

47.    In support of the April 30, 2020, PPP loan application, REARDON submitted the
same fabricated Form 941 as was submitted in support of the earlier Global Disruptive
application.  The same inflated "Payroll Summary" submitted in support of the earlier Global
Disruptive application was likewise supplied by REARDON and certified as true and accurate.

48.    TD Bank denied this second Global Disruptive PPP loan application.  However,
on May 4, 2020, TD Bank erroneously released a second payment of $59,145.00 to Global
Disruptive's checking account as a duplicate deposit of the first PPP loan application.  On May
6, 2020, TD Bank identified the error, and accordingly placed a freeze on the remaining funds in
the checking account ($28,022.57).

### 4.    *Reardon's May 5, 2020 Choice Auto and Membership Holdings PPP loan applications*

49.    Around this time, TD Bank identified that on May 5, 2020, REARDON had
submitted two more PPP loan applications, one for Choice Auto and another for Membership
Holdings.  Each application listed the same average monthly payroll ($23,658.00) and sought the
same loan amount to cover payroll, lease / mortgage interest, and utilities ($59,145.00) as the
earlier two Global Disruptive PPP loan applications.  Each application contained the same
representations and certifications.  The applications were supported by the same Global
Disruptive Form 941 and "Payroll" document.

50.    As discussed above, my review of business records as well as my interviews of
witnesses with knowledge of REARDON's businesses confirmed that neither Choice Auto nor
Membership Holdings had employees.  I have further reviewed IRS tax records and transcripts

1:21-mj-00084-JCN

for Choice Auto nor Membership Holdings.  These records confirmed that neither entity has

submitted employer tax filings for 2020.  REARDON himself, in the "Affiliation List" he

provided to TD Bank, stated that neither entity had employees or gross receipts.  Each entity was

*per se* ineligible for the loan funds sought by REARDON.

51.     Based on my investigation, REARDON therefore knowingly misrepresented and

falsified information to make it appear that Choice Auto and Membership Holdings had

employees for the purpose of obtaining the subject loan funds.

52.     TD Bank declined the Choice Auto and Membership Holdings applications upon

noticing that all information and supporting documentation was the same as that submitted by

REARDON previously for Global Disruptive.

**D.      Reardon's March 2021 Application to TD Bank for Loan Forgiveness**

53.     As detailed above, the PPP applications REARDON submitted to TD Bank in

April and May 2020 contained numerous material misrepresentations and false certifications, and

were further supported by falsified IRS documentation and inflated payroll information.

54.     Despite this, on August 14, 2020, REARDON spoke with TD Bank personnel

about seeking loan forgiveness on the $59,145.00 PPP loan.  In an email on that date from TD

Bank personnel to REARDON recounting the conversation, REARDON was provided

information on PPP loan forgiveness.  REARDON was informed that it was very important for

him to familiarize himself with the PPP loan forgiveness process and requirements, and was

further advised that he should start working through the SBA PPP loan forgiveness application

forms, including all schedules and worksheets.

55.     On December 7, 2020, REARDON again emailed TD Bank personnel asking

about forgiveness of his PPP loan.  TD Bank personnel responded to REARDON that

forgiveness applications were currently being accepted by the bank on-line, and several days later, again directed REARDON to resources about the SBA's requirements of PPP loan forgiveness.

56.     On March 3, 2020, I served REARDON with a letter informing him that he was currently the target of a federal criminal investigation for bank and wire fraud, among other offenses.  I learned that soon after, on March 8, 2020, REARDON submitted an application for loan forgiveness of the $59,145.00 PPP loan to TD Bank.

57.     I have reviewed the loan forgiveness application submitted by REARDON.  For many of the same reasons covered above, the loan forgiveness application contains false certifications and misrepresentations apparently intended by REARDON to defraud TD Bank into forgiving the initial PPP loan, which was itself fraudulently obtained.  For example, REARDON certified as follows:

    a.  That he had complied with all PPP rules, including "eligible uses of PPP loan proceeds" and "the amount of PPP loan proceeds that must be used for payroll costs."

    b.  "[A]ll information supplied about payments for payroll costs, payments on covered mortgage obligations, payments on covered lease obligations, covered utility payments, covered operations expenditures, covered property damage costs, covered supplier costs, and covered worker protection expenditures made during the covered period and all other information provided as part of the Borrower's PPP loan application and application for forgiveness is true and accurate in all respects."

    c. "The information provided in this application is true and correct in all material respects."

    d. "All of the documentation presented as a part of this application is true and correct."

As detailed above, however, REARDON had not complied with the requirements of the PPP, and the other information he had provided as part of Global Disruptive's PPP loan application was intentionally false and misleading.

58.    Further, in support of the forgiveness application, REARDON submitted to TD Bank the same fabricated Form 941 dated April 1, 2020, falsely indicating that Global Technologies had $70,974.61 in payroll expenses for the first three months of 2020.

59.    Finally, in support of the forgiveness application, REARDON submitted a new "Payroll Item Detail" document, purporting to show Global Disruptive's payroll from April 22 through July 15, 2020.

60.    This "Payroll Item Detail" document, based on my investigation and review of banking records, was also materially false, determined as follows:

    a. In May 2020, REARDON stopped banking with TD Bank and opened accounts with Bar Harbor Bank & Trust (hereinafter referred to as "BHBT"). I have reviewed the BHBT business checking account of Global Disruptive, ending in -6769, covering April 22 through July 15, 2020.

    b. REARDON listed the IT Employee as earning $19,962.38 in total salary during the April-through-July 2020 period. Based on my review of the TD Bank records before REARDON moved to BHBT, the IT Employee was paid a total of $3,600.00 in April and May 2020 through TD Bank. However, the

1:21-mj-00084-JCN

only payment the IT Employee received for the remainder of the April-through-July 2020 period, based on my review of the BHBT records, was a check for $300.46 on July 14, 2020.

c.  REARDON listed his father as earning a $4,000.00 salary during the April-through-July 2020 period.  As discussed, REARDON's father was not a Global Disruptive employee.  Based on my review of the BHBT records, REARDON's father only received $500.00 from the account during this time frame, on May 28, 2020.

d.  REARDON also listed on the "Payroll Item Detail" document that Global Disruptive had paid federal withholdings for its employees during the April-through-July 2020 period.  As discussed, Global Disruptive made no federal tax deposits in 2020, did not report compensation paid to any employees, and did not file Forms 940 or 941.

61.    As with the PPP loan applications REARDON submitted to TD Bank in April and May 2020, my investigation has therefore determined that the March 2021 forgiveness application is likewise based on materially false and fraudulent information.

## III.    THE ATTEMPTED WIRE FRAUD

### A.    Introduction to Reardon's Attempted EIDL Wire Fraud

62.    In addition to REARDON's bank fraud, I submit this affidavit to establish a finding of probable cause that REARDON attempted to commit wire fraud against the SBA beginning in April 2020 and extending until approximately September 2021.  REARDON submitted on-line applications to the SBA as part of a separate scheme to fraudulently obtain EIDL funds, which the SBA bases on gross revenues and cost of goods sold.  REARDON did so

for Choice Auto and Membership Holdings, each of which had no operations, employees, gross revenues, or costs of goods sold.

**B.      The SBA's EIDL Program**

63.      The provisions of the CARES Act allowed for the SBA to offer EIDL funding to business owners negatively affected by the COVID-19 pandemic.  Using the SBA on-line portal, EIDL applicants submit personal and business information in support of each EIDL application, and they do not have to submit supporting documentation of any sort.

64.      The application includes a jurat-like paragraph where the applicant affirms that the information submitted is true and correct under the penalty of perjury and applicable criminal statutes.  The application process involves filling out assorted data fields relating to the size of the affected business entity, the ownership of said business, and other information such as the number of employees.  This information, submitted by the applicant, is then used by SBA systems to calculate the principle amount of money the small business is eligible to receive in the form of an EIDL.

65.      The SBA Office of Disaster Assistance ("ODA") controls the EIDL program and is headquartered at 409 3rd Street SW, in Washington, DC.  The ODA has authority over all loans created and disbursed under the EIDL program.  EIDL proceeds are solely funded by the SBA and are disbursed from government-controlled accounts maintained with the U.S. Treasury.

66.      Pursuant to the provisions governing the EIDL program, loan proceeds must be used by that business on certain permissible expenses.  The EIDL (working capital) loans may be used by the afflicted business, which must have existed on and prior to February 1, 2020, to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

67.     Prior to applicants being able to electronically sign and submit an application, the

SBA on-line portal showed the following language:

> On behalf of the individual owners identified in this application and for the business applying for the loan:
>
> …
>
> CERTIFICATION AS TO TRUTHFUL INFORMATION: By signing this application, you certify that all information in your application and submitted with your application is true and correct to the best of your knowledge, and that you will submit truthful information in the future.
>
> WARNING: Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C. 636(b). In addition, any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines and imprisonment, or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions. Statutory fines may increase if amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

### C.     Reardon's Attempts to Obtain EIDL Funds

68.     On July 14, 2020, REARDON submitted SBA EIDL Application No. 3310675403 on behalf of Membership Holdings via the SBA's on-line application portal, accessing and using the website through an IP address identified in SBA records as 45.56.141.81. The application correctly listed $0.00 in gross revenues for the company and $0.00 for costs of goods sold, yet falsely identified having twelve (12) employees as of January 31, 2020. REARDON electronically certified under penalty of perjury that the information he had provided in the application was true and correct, and submitted the application for processing by the SBA.

69.     According to the time stamp information available in the SBA's records, six minutes later on July 14, 2020, REARDON submitted SBA EIDL Application No. 3310676815 on behalf of Choice Auto via the SBA's on-line application portal, accessing and using the

1:21-mj-00084-JCN

website through an IP address identified in SBA records as 45.56.141.81.  The application

correctly listed $0.00 in gross revenues for the company and $0.00 for costs of goods sold, yet

falsely identified having fifteen (15) employees as of January 31, 2020.  REARDON

electronically certified under penalty of perjury that the information he had provided in the

application was true and correct, and submitted the application for processing by the SBA.

70.     On September 8, 2020, REARDON submitted SBA EIDL Application No.

3314332461, a second application on behalf of Choice Auto via the SBA's on-line application

portal, accessing and using the website through an IP address identified in SBA records as

198.255.228.27.  The application now misrepresented having $2,000,000.00 in gross revenues

for the company and $1,850,000.00 for costs of goods sold, and falsely identified having twenty-

eight (28) employees as of January 31, 2020.  REARDON electronically certified under penalty

of perjury that the information he had provided in the application was true and correct, and

submitted the application for processing by the SBA.

71.     Using a reliable and publicly available IP search engine,

https://www.ipaddress.com/ip-lookup, I determined that the 45.56.141.81 IP address was

geographically located in the United States, and that the 198.255.228.27 IP address utilized by

REARDON was geographically located in Maine.

72.     According to information provided to me by the SBA, the applications were

submitted via the SBA's website, https://covid19relief.sba.gov/#/.  The server used to route all

applications submitted by REARDON was located in West Des Moines, Iowa.  Any payments of

EIDL funds would have been processed by the SBA through Denver, Colorado.

73.     The above-referenced EIDL applications were denied by the SBA.

1:21-mj-00084-JCN

74.    My review of business records as well as my interviews of witnesses with knowledge of REARDON's businesses confirmed that neither Choice Auto nor Membership Holdings had employees.  I have further reviewed IRS tax records and transcripts for Choice Auto and Membership Holdings, which confirmed that neither entity has submitted employer tax filings for 2020.  REARDON himself, in the "Affiliation List" he provided to TD Bank, stated that neither entity had employees or gross receipts.  Each entity was therefore *per se* ineligible for the loan funds sought by REARDON.  Based on my investigation, REARDON therefore knowingly misrepresented and falsified information to make it appear that Choice Auto and Membership Holdings had employees for the purpose of obtaining the subject loan funds.

75.    As discussed, REARDON devised and attempted to perpetrate this fraudulent scheme through the use of interstate wire transmissions.

76.    The attempted wire fraud scheme occurred in relation to a presidentially-declared national emergency arising from the COVID-19 pandemic, declared on March 13, 2020 by President Donald J. Trump pursuant to Section 501(b) of the Stafford Act.  *See* FED. REG. 85 FR 15337, at 15337-38 (Mar. 13, 2020)

## IV.    CONCLUSION

77.    Based on my knowledge, training, and experience, as well as the facts set forth herein, I have probable cause to believe and do believe that REARDON has committed bank fraud, in violation of Title 18, United States Code, Section 1344.

78.    Based on my knowledge, training, and experience, as well as the facts set forth herein, I have probable cause to believe and do believe that REARDON further attempted to commit wire fraud, in violation of Title 18, United States Code, Section 1343 and 1349.

1:21-mj-00084-JCN

79.    As stated, this affidavit is based on facts known to me at this time, and to the

extent I ascertain new facts during the course of my investigation, those facts will be considered.

My investigation is ongoing and will continue with respect to any PPP or EIDL loans sought by

REARDON throughout 2021, for example, with respect to TD Bank or BHBT.

*    *    *    *    *

I, William Phelan, hereby swear under oath that the information set forth in this affidavit

is true and correct to the best of my knowledge, information, and belief, and that I make this oath

under pains and penalties of perjury.

Dated at Andover, Massachusetts, this 8th day of April, 2021.

_____
William Phelan
Special Agent
U.S. Treasury Inspector General for Tax Administration

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: ____Apr 08 2021____

City and state: ____Bangor, ME____

_____
Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title

30